40401, 40410.   PIEDMONT LIFE INSURANCE COMPANY
v. BELL; and vice versa.
40402.   BELL v. PIEDMONT LIFE INSURANCE
COMPANY.

DECIDED FEBRUARY 4, 1964—REHEARING DENIED
MARCH 4, 1964.

*Wiggins & Smith, Robert S. Wiggins, Lokey & Bowden, Hamilton Lokey,* for plaintiff in error.

*Reeves & Collier, Merrell Collier,* contra.

RUSSELL, Judge. ■ (a) Certain facts appear without ma-

terial dispute from this highly complicated record. One is that the contract between Bell and the corporation for the sale of stock was not reduced to writing. There is testimony of some of the witnesses who had made notes of what transpired at meetings as to their recollection based on such notes; there had been resolutions incorporated in minutes of the early meetings, but these had disappeared by the time the case came to trial. It was agreed that 100,000 shares of stock as authorized by the charter would be issued in blocks of 10,000 each; that until issuance as it might in its discretion decide the corporation would incur no liability whatever to the plaintiff; that four blocks of 10,000 shares each were issued, one of which was primarily set aside for stock option warrants; that after September 19, 1955, there were sales of only 6,418 shares of stock for a total consideration of $228,530 and Bell was not paid any commissions on these, he having been informed by letter on October 14, 1949, that because of the company's investigation into the matter of commissions on stock warrants and because of the fact the sale by him of the presently authorized stock was unsatisfactory to the company, the sale of the stock would in the future be handled under the supervision of the president of the company. "Commissions are being paid to such persons as are authorized by me to sell the common stock of the company." On November 14, 1956, the merger took place. Outstanding shares of stock in the defendant corporation continued in existence. The defendant issued 277,411 shares of which stock of the stated value of $15,315,940.75 was debited to capital stock in exchange for securities owned by the merging corporation and the remainder to capital surplus. The plaintiff testified to his agreement substantially as alleged in the petition; that is, that if the original block of 10,000 shares was satisfactorily disposed of (which no one contends it was not) he would have the exclusive right to sell the remaining 90,000 shares if and when issued, and that the company covenanted not to sell, transfer or dispose of any of these shares without first paying him 10% of their value. Several officers of the company who were original incorporators testified; their testimony is in basic accord only on the question of Bell's right to sell the first block. Most of them recognize that

when this was satisfactorily accomplished Bell would continue to be involved in sales. Handwritten notes support the testimony of one such witness to the effect that "if agreement is complied with [as to the first 10,000 shares] Bell will get all other issues in blocks of 10,000 or more. Bell gets negotiated commission but not less than 5%." On December 15, 1949, Bell in answer to an inquiry by the then president of the company as to what he contended his position to be, replied: "It was, has always been, and is my firm understanding with the original Board of Directors, both before you came into the picture, and thereafter, that I was to have the exclusive right to handle the sale of the entire 100,000 shares of stock authorized by the original charter for a period of ten years, and that I was to receive a commission of ten percent of the purchase price of each share sold during said period." This letter is the subject of sharp analysis by both parties: the defendant contends it should control over Bell's testimony that no stock would be "disposed of" without his receiving 10% by showing that Bell at the time claimed commissions only on stock sold, while plaintiff attempts to explain the letter by saying that commissions on stock sales was the only question being argued by the parties at that time. The letter does not as a matter of law prevail over the testimony, but it was a question for the jury to consider in determining whether the contract was as Bell contends in his petition. *Faulkner v. Brown*, 92 Ga. App. 602 (1) (89 SE2d 583). Other officers of the defendant corporation testified as to their recollection of the arrangement: Wilson testified that the plaintiff was to receive 10 percent as long as his services were satisfactory in the opinion of the directors; Kendrick, that as new stock was issued to the public whether or not he would continue to sell depended on satisfactory service; Steel, that he would have an exclusive right to sell as long as his service was satisfactory. Some of the directors felt that Bell should receive 10 percent on purchase under stock option warrants during the time his contract was admittedly in force and others not. Bell did receive commission on some stock which directors and officers purchased directly and apparently some on sales made by them to others during a part of the period; later some small amounts of stock

were sold and commissions paid directly to others. It is obvious from these few statements out of a vast wealth of testimony that the terms of the contract, especially insofar as they would affect Bell's right to commissions on stock not sold to the public but issued and disposed of in return for the property of the corporation merging with it, was in conflict on many points. Under these circumstances no directed verdict could possibly have been sustained, from which it follows that the court properly overruled both motions for judgment notwithstanding the verdict. *Norris v. Coffee,* 206 Ga. 759 (4) (58 SE2d 812).

(b) Bell contends, however, that since the jury found in his favor it necessarily found that he had a right to recover, and that he should therefore have judgment for the amount which the jury would have been authorized to return in his favor (that is, $397,304.80) whereas the defendant contends in a special ground of its motion for a new trial that the verdict rendered must fall because it cannot under any theory of the case be sustained in the sum in which it was rendered, citing *Roddenberry Hdw. Co. v. Merritt,* 17 Ga. App. 425 (87 SE 681), *Avery & Co. v. Middlebrooks,* 20 Ga. App. 724, 725 (93 SE 227), and *King v. Loeb,* 93 Ga. App. 301 (1) (91 SE2d 532). The latter case contains a necessary holding only to the extent that where the plaintiff's proof does not support a verdict in the amount found by the jury, the remedy is not by judgment notwithstanding the verdict. Whether or not a motion for a new trial would afford a remedy must depend on the facts of the case. It would definitely support such a motion where the amount of the verdict is not within the *range* of the evidence. The problem here is not this problem: the jury might have returned a general verdict for the defendant; the jury might have decided that Bell was entitled to his 10% on the value of stock sold by others to the public in the sum of $22,853.00, or it might have decided that he was entitled because of the breach to 10% of all stock *issued and disposed of,* which latter would include the merger stock (entered on the books of the company as a sale but not sold to the public) making the total figure $393,391.80. The contention is that no other figure (disregarding interest of course) can be supported by evidence and renders good the general grounds as

well as special grounds 4 and 5 of the motion for a new trial. This problem has been met before. In *Hicks v. Walker*, 17 Ga. App. 391, 394 (87 SE 152) it was held: "The evidence would have authorized a finding for the full amount. As to how or upon what reasoning the jury found their verdict, this court is without knowledge. It is sufficient for us that there was evidence authorizing the verdict returned; and a defendant will not be heard, under such circumstances, to complain that a verdict was rendered for the plaintiff for a less amount than he might legally have been entitled to recover." In view of the size of this verdict it is obvious that the jury found the plaintiff was entitled to recover something against the stock "issued and disposed of" within the 10-year period of the exclusive contract, just as it is obvious that the jury believed Bell when he said that he did have an exclusive contract to sell, the benefits of which he was unreasonably deprived of by the defendant. It therefore appears that the point is controlled by *Johns v. League, Duvall & Powell, Inc.*, 202 Ga. 868 (45 SE2d 211, 174 ALR 757) which also involved an oral contract for commissions on sales where the jury returned a verdict for approximately half the amount to which the plaintiff was entitled under his version of the contract. The court, after analyzing and distinguishing cases cited to the contrary, held that "a defendant against whom a verdict has been returned can not complain that the verdict is for a less amount than that which the plaintiff was entitled to recover if entitled to recover at all." P. 872. Such a verdict is, as to the defendant, harmless error. Additionally, it appears in this case that the plaintiff agreed out of his commissions to pay all expenses of selling, including expenses of hiring a sales force to work under him, and the jury might well have concluded that he would not be entitled to a net 10 percent where such a large block of stock was involved. These grounds of the motion are without merit.

■ Former *Code* § 56-522 provides in part that no person selling stock in an insurance company "shall receive either directly or indirectly more than 10% of the sales of any of said stock." It is contended by the plaintiff in error that the allegations of Bell's petition, and his testimony on the trial of the

■

case, conclusively establish that he did in fact indirectly receive more than the legal compensation for selling stock under his contract; that accordingly the contract is contrary to public policy and void, and that even though this court held when the case was here on demurrer that the petition set forth a cause of action, which is admittedly the law of the case, nevertheless the holding was made by inadvertence because of the fact that counsel did not in argument of the case cite the statute to the court and the court ruled in ignorance of its purport, and that in any event the doctrine of law of the case should not prevail over that of public policy as enunciated by the statute. We do not find it necessary to decide the latter question. Although *Code* § 56-522 was not specifically dealt with in the opinion it appears that the court was not in fact ignorant of its existence. The court was of the opinion then, and is of the opinion now, that the statute refers to financial remuneration for stock sold. While Bell says that the 10% he received on stock actually sold by him was only part compensation, and that the agreement contemplated that if he sold the first block of shares in a satisfactory manner he would be granted the exclusive right to sell the remaining 90,000 shares, his remuneration for the total 100,000 shares would not be over 10 percent. It thus appears that the exclusive right to sell depended upon and was in effect compensation for proper performance of the first part of the contract. It is true that, if the company thereafter breached this contract and allowed others to sell, this would not prevent the agent having an exclusive sales contract from insisting on 10 percent under the terms of the contract. The 10 percent, as to stock which should have been offered to such a salesman to sell but was not, is not an "additional compensation" of the 10 percent received on stocks actually sold by such salesman, but is the measure of damages for the breach of the contract. The right to sell additional shares is a valuable right and would lead to monetary return, but it is not "more than 10%" of the purchase price of stock actually sold. The contract, if the jury believed this was in fact the contract, would have given Bell 10% of all the stock but this would have been no more than an agent is allowed to receive for selling all the stock. When the contract

was breached the percentage of stock not sold is not "10% of the sales" but is damages for the loss of the 10% of sales which the plaintiff contends would have been received in the absence of the breach. The contract was accordingly not contrary to public policy, and this question was implicitly, if not in *totidem verbis* disposed of on the first appearance of the case. This ruling also disposes of grounds 10, 11, and 12 of the defendant's motion for a new trial.

■ Special grounds 6, 7 and 8 of the motion for a new trial will be considered together. In his petition which was held by the court to state a cause of action in *Piedmont Life Ins. Co. v. Bell,* 108 Ga. App. 225, supra, the plaintiff alleged that the contract on which he sued was entered into "by the defendant insurance corporation at a formal and organized corporate meeting of said defendant insurance corporation at which all of the directors, stockholders and officers of the defendant insurance corporation were present and acting, namely, R. W. McGarity, H. Benson Ford, Alexander E. Wilson, Jr., Eldon R. Lindsey, Sam Kendrick, Emmet H. Steele, Sr., Harrell W. McEachern and W. C. Cottingim." The charter was granted in 1946 and subsequently thereto, but before $100,000 was raised on stock subscriptions, the meeting was held at which according to Bell's testimony the contract was consummated. Minutes of this meeting were among those subsequently lost. The eight persons named above were incorporators and were present at the meeting. All had subscribed for stock and the corporate officers were chosen from among them. Subsequently, after the stock was fully subscribed in 1947, another meeting was held at which it was voted to ratify "all actions taken by the incorporators in connection with the establishing and organization of the company, obtaining of a corporate charter, selling of the company's capital stock and acceptance of subscriptions for said stock, the designation of a temporary Board of Directors to handle the company's affairs pending the first meeting of the stockholders, and any other activities or functions performed for or in behalf of the company." The defendant objected to admission of testimony by Bell as to the nature of the agreement on the ground that any such contract at the time entered into was ultra vires,

and that in view of conflicting testimony by the directors present as to what the contract terms were, the ratification resolution was also improperly admitted in evidence, and that it was further error for the court to charge the jury that such a contract under these circumstances might be the subject matter of ratification.

*Code* § 56-203 as it existed in 1946 provided for the issuance of a certificate by the Secretary of State granting "full authority . . . to exercise the powers and privileges of a corporation." Thereafter the incorporators and persons becoming stockholders "shall be a corporation by the name specified in said certificate, and shall possess the powers and privileges and be subject to the provisions contained in this Chapter." *Code* § 56-204. Thereafter the company "may open books of subscription to obtain the full capital stock of the company, and, after giving such notice as they may deem expedient, may from time to time receive subscriptions until the whole capital stock shall be subscribed. The capital stock of said company shall be divided into shares of $10 each, and shall not be less than $100,000 for each class of insurance to be engaged in, and no insurance company chartered under this Chapter shall *commence the insurance business* until at least this amount for each class of insurance to be engaged in shall have been paid in cash. . ." *Code* § 56-207. (Emphasis added). The defendant's contention is that under the last quoted section it was beyond the power of the company to contract with Bell because this was in effect engaging in the insurance business. We do not agree that such was the meaning of the statute. As stated in Home Title Ins. Co. v. U. S., 50 F2d 107, 110: "The business of insurance consists in accepting a number of risks some of which will involve losses, and of spreading such losses over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it." Getting stock subscriptions is a proper part of the business of the corporation, but it is a condition precedent to commencing the business of insurance. This result was reached in Hughes v. Four States Life Ins. Co. (Tex. Civ. App.), 164 SW 898, where the court held: "It is not believed that the selling of the stock for which the notes in suit

were given was transacting or doing business in the sense of the statute." The evidence was accordingly not inadmissible on the ground that there was a fatal variance between the allegata and the probata. This being so, testimony concerning and instructions on the subject of ratification were not harmful to the defendant. While the terms of the agreement were in dispute, the fact that the contract, if it existed at all, was entered into under the circumstances here set forth was undisputed. These grounds are without merit.

■ An attorney who acted as general counsel for the defendant between March, 1949, and January, 1951, was called by the plaintiff. His testimony was that after becoming general counsel he consulted with the plaintiff and others and attempted to reduce to writing the prior agreement between the parties; that Mr. Bell would not sign the agreement he drew up at that time because he contended it was inaccurate in given respects, and in other respects was not satisfactory to the directors of the corporation. The witness discussed the provisions of his draft in some detail and pointed out that it had been signed by neither party. One of the differences of opinion involved the question of whether Bell should be paid commissions on stock bought by previous stockholders under option warrants, in which connection counsel had written Bell on October 14, 1949: "All of the temporary board of directors say that it was specifically understood that no commissions would be paid on the sales of stock to be made when the option warrants were exercised." He then testified over objection that in his opinion, in the absence of such a provision in the contract, Bell would be entitled to commissions on such sales. The construction of a contract, once its terms are ascertained, is for the court. *Early v. Kent,* 215 Ga. 49 (2) (108 SE2d 708). This witness was not construing an ascertained and unambiguous contract; he was testifying as to his investigations leading to a conclusion on his part as to what the contract was in fact, which was a part of his job as counsel for the defendant, and the testimony, although stated as an opinion, in fact concerned the terms of the contract as disclosed by his investigation and not the interpretation of agreed terms. Special ground 9 contains no reversible error.

■ (a) Certain demurrer rulings remain to be considered, particularly the court's action in striking an amendment to the defendant's answer which alleged that "its authority to issue any further shares under its original charter having been superseded and pre-empted by the new authority vested in said surviving corporation," there were in fact no 63,886 unissued shares of the original 100,000 authorized shares of the defendant corporation prior to the merger, and after the merger the authorized total of 700,000 shares authorized to be issued constituted new and different stock. We have noted that the issued 36,114 shares continued in existence. Stock in the merged Piedmont-Delaware Corporation was to be exchanged for stock in the defendant at a ratio of something over five to one. "The corporate existence of Piedmont-Georgia, as a stock life insurance company organized and existing under the laws of the State of Georgia, shall continue under the charter of Piedmont-Georgia as amended . . . and under the name of Piedmont Life Insurance Company. . . Each share of Piedmont-Georgia, outstanding at such effective date [of this merger agreement] shall, without any further action on the part of the respective holders thereof, be, and continue to be, one fully paid and non-assessable share of capital stock of the surviving corporation." It thus appears that the charter was merely amended, among other respects, so as to provide that the total authorized outstanding stock of the corporation after the amendment should be 700,000 instead of 100,000, and of the 700,000 shares those already issued continued in existence and new stock took its place along with the old. In view of these facts, supported as they are by the bookkeeping device under which shares of the unissued stock originally authorized were transferred on the books of the company for assets of the Delaware Corporation whose corporate existence ceased upon the merger, it cannot be said that the 63,886 shares were not "issued" or "disposed of," or that as the defendant contends they never came into existence at all, nor is any authority cited for this position. The court did not err in striking that paragraph of the answer which attempted to contend in substance that there was no subject matter upon which the contract as urged by Bell could become operative.

(b)   It was held when the case was here before that the action in its amended form was brought for breach of contract within the period of the statute of limitation.   The action was one at law, and the main issue was what constituted the terms of the contract.  Since there is no burden on a plaintiff to inform a defendant in advance that he intends to sue if the defendant breaches his contract (this being a legal right of which the opposite contracting party is presumably cognizant) it was not error to strike the paragraph of the answer alleging that the plaintiff was estopped to claim commissions on the stock under consideration for the reason that he had not so informed the defendant in advance.

There is no error in the rulings of the trial court.

*Judgments affirmed in case Nos. 40401 and 40402.  Cross bill of exceptions dismissed.  Eberhardt, J., concurs.  Felton, C. J., concurs specially.*

Felton, Chief Judge, concurring specially.  I concur in the judgments and the opinion.  I specially concur in the ruling in Division 1 (a) solely because we are bound by decisions of the Supreme Court.  In my opinion a finding for a plaintiff in an intermediate amount not authorized and supported by evidence may be excepted to by the defendant as being contrary to and not supported by the evidence.  Of course a defendant may not except to a verdict where a *larger* amount was *demanded* or *authorized by the range of the evidence.*  I think the Supreme Court cases holding generally that a defendant can not except to a verdict which was too small come under three categories: (1) where a larger amount was demanded;  (2) where a larger amount was authorized under the "range" of the evidence; and (3)  cases where the amount rendered was not under any theory or reasoning supported by evidence and were a result of compromise or guess but where the court *mistakenly* applied the rule applicable to categories (1) and (2).